

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-13-2004

# Kosiba v. Merck Co Inc

Precedential or Non-Precedential: Precedential

Docket No. 02-2668

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Kosiba v. Merck Co Inc" (2004). *2004 Decisions.* Paper 282.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/282

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

_____

NO. 02-2668

MICHAELEEN KOSIBA; CELESLIE
EPPS-MALLOY

v.

MERCK & COMPANY; UNUM LIFE
INSURANCE
COMPANY OF AMERICA; MERCK &
CO., LONG TERM
DISABILITY PLAN FOR UNION
EMPLOYEES

Celeslie Epps-Malloy,

*Appellant*

_____

On Appeal From The United States
District Court For The District Of New
Jersey
(D.C. No. 98-cv-03571)
District Judge: Honorable Mary Little
Cooper
Argued June 28, 2004
Before: AMBRO, BECKER, and
GREENBERG, Circuit Judge

(Filed September 13, 2004 )

CHARLES F. SZYMANSKI (Argued)
Markowitz & Richman
121 South Broad Street
Suite 1100
Philadelphia, PA 19107

*Attorney for Appellant*

PETER J. HECK (Argued)
Del Mauro, DiGiaimo, Knepper & Heck
8 Headquarters Plaza
North Tower
Morristown, NJ 07960

*Attorney for Appellee*

_____

OPINION
_____

BECKER, *Circuit Judge*.

Plaintiff Celeslie Epps-Malloy is a former employee of defendant Merck & Co. ("Merck"), who participated in Merck's ERISA-based Long Term Disability Plan for Union Employees (the "Plan").[1] At times relevant, Merck, as overall plan administrator, had delegated responsibility for claims administration to defendant UNUM Life Insurance

_____

[1]Michaleen Kosiba, the other named plaintiff in this case, settled her case against the defendants in the District Court, and is not participating on appeal.

Company of America ("UNUM").[2] Following an at-work injury and a diagnosis of sarcoidosis and fibromyalgia, Epps-Malloy applied for and received long-term disability (LTD) benefits from the defendants in 1993. During a periodic review conducted in 1996, the defendants terminated Epps-Malloy's benefits, finding that she was no longer totally disabled under the terms of the Plan. During the course of the Plan's administrative appeals process, Merck requested that Epps-Malloy undergo an independent medical examination, and designated a pulmonologist, Dr. Gautam Dev, to evaluate her. Dr. Dev's report contradicted Epps-Malloy's treating physicians' diagnoses, and on this basis the defendants upheld their denial of continued benefits. Epps-Malloy then filed this suit under 29 U.S.C. § 1132(a)(1)(B), seeking benefits allegedly due her under the terms of the Plan.

Epps-Malloy's claim survived summary judgment, and the District Court held a Fed. R. Civ. P. 52(a) bench trial on a stipulated documentary record. The Court concluded that under *Pinto v. Reliance Standard Life Insurance Co.*, 214 F.3d 377 (3d Cir. 2000), and its progeny, the structural arrangement among Merck, the Plan, and UNUM did not warrant a departure from the traditional "arbitrary and capricious" standard of review over ERISA plan fiduciaries' discretionary decisions regarding benefits. Turning to the merits of Epps-Malloy's claim, the District Court found, principally because of Dr. Dev's report, that the defendants' denial of benefits was not arbitrary and capricious.

On appeal, we concentrate on the District Court's first conclusion. We agree with the District Court that the record in this case does not support finding a financial conflict of interest (which, under *Pinto*'s "sliding scale" approach, would warrant a standard of judicial review less deferential than arbitrary and capricious review), and that delegation by Merck to UNUM of claims administration would ordinarily preclude heightened review. However, there is evidence of procedural bias in Merck's intervention in the appeals process to request an independent medical exam. This is especially problematic because the record before the defendants prior to Dr. Dev's examination provided reasonably sound as well as unequivocal support for Epps-Malloy's claim for benefits; the choice to request a third medical opinion therefore strongly suggests a desire to generate evidence to counter Epps-Malloy's physicians' diagnoses. Because Merck's intervention, notwithstanding its delegation of claims administration to a large and experienced carrier, undermines the defendants' claim to the deference normally accorded an ERISA plan fiduciary with discretionary authority, we conclude that the District Court should have applied a moderately heightened arbitrary and capricious

---

[2]We shall refer to Merck, the Plan, and UNUM collectively as "the defendants" except where it is necessary to distinguish them.

2

standard of review. Additionally, with respect to the merits, the District Court failed to address Epps-Malloy's fibromyalgia diagnosis, an omission which itself alone would require a new trial. For these reasons, we will reverse the judgment of the District Court and remand for a new trial.

## I. Factual Background and Procedural History

Although the District Court, which rendered its opinion following a Fed. R. Civ. P. 52(a) bench trial on a stipulated documentary record, gave a lengthy account of the parties' factual contentions, it by and large did not make findings of fact as required by Rule 52(a). As such, what follows is not so much the District Court's factual findings as it is our own summary of the record before us.

### A. Epps-Malloy's Medical History

Epps-Malloy was employed by Merck as a cook and food-service attendant. She suffered an injury at work in 1991, and was diagnosed with fibromyalgia, chronic pain syndrome, and sarcoidosis.[3] She was

granted short-term disability benefits by the defendants in October 1992. In October 1993, she was approved for LTD benefits, but was reminded that periodic requests for medical information would be made in the future to ensure continued eligibility (i.e., to determine that she continued to be completely disabled under the Plan). Around the same time, Epps-Malloy applied for Social Security disability benefits. In 1994, an administrative law judge overruled the Social Security Administration's (SSA) initial determination denying her Social Security benefits, and awarded her Social Security long-term disability benefits, finding her permanently disabled.

Epps-Malloy's benefits were provided under the terms of the Merck & Co. Long

---

[3]It is unclear from the record whether there was any causal relationship between the injury—a stack of food service trays falling on Epps-Malloy—and the ailments that form the basis of her claim. Fibromyalgia (also referred to as fibromyositis) is "any of a group of nonarticular rheumatic disorders characterized by pain, tenderness, and stiffness of muscles and associated connective tissue structures." *Merriam-Webster Medical Dictionary* (2002), *at* http://www.dictionary.com. The cause is unknown. Sarcoidosis is "a disease of unknown origin marked by formation of granulomatous lesions that appear especially in the liver, lungs, skin, and lymph nodes." *American Heritage Stedman's Medical Dictionary* (2002), *at* http://www.dictionary.com. A granuloma, in turn, is a "[c]hronic inflammatory lesion characterised by large numbers of cells of various types (macrophages, lymphocytes, fibroblasts, giant cells), some degrading and some repairing the tissues." On-line Medical Dictionary, *at* http://cancerweb.ncl.ac.uk/omd/index.html.

Term Disability Plan for Union Employees, an ERISA plan. By the Plan's terms, "[Merck] shall pay the cost of the benefits provided under the Plan," though the Plan gives discretion to the Management Pension Investment Committee to choose "any funding method, or combination of funding methods which are permissible under ERISA." The District Court found that no evidence was introduced on how Merck actually funded the plan, and the parties do not dispute this on appeal. The Plan allocates fiduciary responsibility among a committee of Merck's Board of Directors (which has certain powers of appointment); the Merck Management Pension Investment Committee (which is responsible for the investment and management of Plan funds); and Merck itself, which is the plan administrator. As plan administrator, Merck has the power to appoint a claims administrator, who "shall determine claims for benefits by Participants under the Plan." At the time Epps-Malloy's LTD benefits were first granted, Thomas L. Jacob & Associates ("TLJ") was Merck's appointed claims administrator; later, appellee UNUM was the claims administrator. Notwithstanding this appointment, the Plan confers on Merck (as plan administrator) the powers "to construe the Plan"; "to decide all questions of eligibility"; and "to request and receive from all Participants such information [as is] necessary for the proper administration of the Plan."

B. Termination of Epps-Malloy's LTD Benefits

In May 1996, as part of a periodic review of Epps-Malloy's benefits, UNUM requested information from her treating physicians, Dr. Panullo and Dr. David Williams. Dr. Panullo was Epps-Malloy's gynecologist. Epps-Malloy's disability is not related to any gynecological condition, so Dr. Panullo's reports are irrelevant—though they seem to have been misunderstood by UNUM, at some points, to indicate that Epps-Malloy was entirely able to work, when they in fact say only that no gynecological problems prevented Epps-Malloy from working. We therefore say no more about Dr. Panullo.

Dr. Williams's notes from January 16, 1996, refer to Epps-Malloy's sarcoidosis and her fibromyalgia. According to his notes, the sarcoidosis had been diagnosed by a 1989 bronchoscopy; the record does not disclose when the initial fibromyalgia diagnosis was made. Dr. Williams's June 14, 1996, notes state that "[s]arcoidosis is her diagnosis as well as fibromyalgia," and he indicated that she was being medicated for fibromyalgia. In response to an UNUM questionnaire dated October 28, 1996, Dr. Williams stated that Epps-Malloy was "disabled to light activity because of shortness of breath" and that his prognosis for her to return to gainful employment on a part-time basis or full-time basis was "never."

UNUM informed Epps-Malloy on December 31, 1996 that it was terminating her benefits. The letter explained that a review of medical documentation, including information from Drs. Panullo and Williams, led UNUM to conclude that

4

she no longer met the definition of being "unable to perform any and every duty" of her occupation, as required by the Plan. The letter also stated that "there is no evidence to support that you are medically incapable to perform the duties of your occupation." The letter further informed Epps-Malloy that she would have to come forward with objective medical evidence of her disability.

Epps-Malloy administratively appealed this decision. She provided additional information to UNUM, including the name of her new treating physician, Dr. Fred McQueen. Dr. McQueen repeated the fibromyalgia diagnosis, stated "[s]he cannot return to gainful employment," and that he did "not feel it in her best interest to be under any stress due to triggering her sarcoid remission." Dr. McQueen concluded: "Permanently & totally disabled. Suffers with severe anxiety. She cannot cope with stress."

Upon receiving Dr. McQueen's report, UNUM wrote to Epps-Malloy stating that "Merck & Company has requested an Independent Medical Exam." The defendants designated Dr. Dev to perform the examination. We rescribe Dr. Dev's report in the margin;[4]

non-productive and worse upon laying down. The patient also has post-nasal drip and chronic sinus problems. Her exercise tolerance is minimal, and she is barely able to achieve her day-to-day activities. The patient was treated in the past with steroids; however, could not tolerate them because of what appears to be psychosis and marked degree of weight gain. She has a history of smoking one pack per day for six years.

> [Physical exam reveals nothing amiss; pulmonary function was normal; blood gases were near normal]

> My impression of Mrs. Epps-Malloy is that her symptomatology is not commensurate with her clinical presentation. Considering the normal pulmonary function test and near normal arterial blood gas, I have a difficult time ascribing sarcoidosis as a cause of her symptomatology. She appears to be somewhat emotional and I cannot reliably exclude malingering behavior. On the contrary, the endobronchial sarcoid may be leading to a persistent cough and dyspnea. Chronic sinusitis can also exacerbate a respiratory condition and lead to some degree of shortness of breath. The patient's impaired cardiac status is also a possibility and an exercise stress

---

[4] I saw Celeslie Epps-Malloy on 5/8/97. The patient is a 47 year old female with a history of sarcoidosis reportedly diagnosed by a transbronchial biopsy in 1987. The patient currently presents for medical evaluation for her complaints of shortness of breath on minimal exertion and also complains of cough, which is

in sum, Dr. Dev concluded that a diagnosis of sarcoidosis was "incompatible with her clinical presentation"—i.e., that he disagreed with the sarcoidosis diagnosis. He did not opine on her fibromyalgia diagnosis. Based on Dr. Dev's report, UNUM upheld its decision denying benefits.

## C. Proceedings Before the District Court

Epps-Malloy filed this suit, seeking benefits allegedly due her under the terms of the Plan under 29 U.S.C. § 1132(a)(1)(B), and other relief. Merck counterclaimed to recoup, under the terms of the Plan, the Social Security disability benefits Epps-Malloy had received. The counterclaim was settled, and the District Court denied summary judgment on Epps-Malloy's § 1132(a)(1)(B) claim. The case therefore proceeded to a trial on the merits, which was conducted as a Fed. R. Civ. P. 52(a) bench trial on a stipulated documentary record. Canvassing *Pinto v. Reliance Standard Life Insurance Co.*, 214

---

> test might be able to help answer some of the unanswered questions.
>
> I feel, based on her pulmonary function tests and arterial blood gas information, that her present diagnosis is incompatible with her clinical presentation.

Dr. Dev's description of when and how Epps-Malloy's sarcoidosis was first diagnosed conflicts with that of Dr. Williams; it is not clear whether this inconsistency is significant.

F.3d 377 (3d Cir. 2000), and its progeny, the District Court first concluded that an "arbitrary and capricious" standard of review applied to its judicial review of the defendants' denial of benefits. The Court then concluded that their denial of benefits was not arbitrary and capricious. It therefore entered judgment for the defendants.

## II. Our Standard of Review Over the District Court's Decision

In the post-*Pinto* era, we appear to have had only one case in the same procedural posture as this one, i.e., an appeal from a bench trial. In *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 441 (3d Cir. 2001), we stated (without further elaboration or citation) that in such an appeal "[w]e have plenary review over a district court's conclusions of law, and we review its factual conclusions for clear error." This is, of course, the usual standard of review on appeal from a bench trial. *See In re Unisys Savings Plan Litig.*, 173 F.3d 145, 149 (3d Cir. 1999). Determining the proper standard of judicial review under *Pinto* is a question of applying law to fact; accordingly, our review is plenary, though we review a district court's underlying factual findings only for clear error. Because we conclude the District Court applied too deferential a standard of judicial review, we do not reach the merits of Epps-Malloy's claim.

## III. Standard of Judicial Review over Unum's Determination of Epps-Malloy's

Claim

Our principal task is to determine whether the District Court applied the appropriate standard of judicial review to the defendants' decision to deny LTD benefits to Epps-Malloy. We begin with a discussion of *Pinto* and our cases following it, and then turn to the proper standard of judicial review in this case.

### A. *Pinto* and Its Progeny

We held in *Pinto* that, in reviewing an ERISA plan fiduciary's discretionary determination regarding benefits, a court must take into account the existence of the structural conflict of interest present when a financially interested entity also makes benefit determinations. Specifically, we adopted a "sliding scale" approach, in which district courts must "consider the nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious review of the benefits determinations of discretionary decisionmakers." *Pinto*, 214 F.3d at 393. This "sliding scale" method "intensif[ies] the degree of scrutiny to match the degree of the conflict." *Id.* at 379.

*Pinto* offered a nonexclusive list of factors to consider in assessing whether a structural conflict of interest warranting heightened review exists. The sliding-scale approach "allows each case to be examined on its facts." *Id.* at 392. Among the factors we identified were "the sophistication of the parties, the information accessible to the parties, and the exact financial arrangement between the insurer and the company." *Id.* Also

relevant is "the current status of the fiduciary," *id.*, i.e., whether the decisionmaker is a current employer, former employer, or insurer. Our cases have addressed various combinations of these factors. In *Pinto* itself, we concluded that "heightened arbitrary and capricious review," *id.* at 393, or review "on the far end of the arbitrary and capricious 'range,'" *id.* at 394, was appropriate because Pinto's insurer both made benefits determinations and funded the benefits, and because of various procedural anomalies that tended to suggest that "whenever it was at a crossroads, [the insurer defendant] chose the decision disfavorable to Pinto." *Id.*

Turning to *Pinto*'s progeny, we first note that in some cases the parties stipulate to the applicable standard of judicial review, or at least do not contest the District Court's choice of a standard of review. *See, e.g.*, *McLeod v. Hartford Life & Accident Ins. Co.*, 372 F.3d 618, 623-24 & nn.3-4 (3d Cir. 2004); *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.*, 222 F.3d 123, 129 (3d Cir. 2000). Other cases, though they cite *Pinto*, are factually too far removed from the facts of this case to provide meaningful guidance. *See, e.g.*, *Goldstein*, 251 F.3d 433 (unfunded executive deferred compensation, or "top hat," plan).

While *Pinto* addressed the case of an insurer both making benefits determinations and paying claims, it did not definitively decide whether any form of heightened review applies to employers

7

both making benefits determinations and paying claims. When an employer pays claims out of its general operating funds—the situation most likely to introduce a structural conflict because the employer feels an immediate "sting" from paying a claim—the plan is referred to as "unfunded" or sometimes "self-funded." This is in contrast to "the typical employer-funded pension plan" which "is set up to be actuarially grounded, with the company making fixed contributions to the pension fund." *Pinto*, 214 F.3d at 388.

We confronted (but were ultimately able to avoid) ruling on the issue of whether heightened review applies to employers making benefits determinations and paying claims in *Skretvedt v. E.I. DuPont de Nemours & Co.*, 268 F.3d 167 (3d Cir. 2001). That case concerned (among other things) an employer-administered unfunded benefit plan, and noted that "a heightened standard of review might be applicable to the [employer-controlled] Board's denial of Skretvedt's claim for the unfunded . . . benefits, because of the potential conflict under *Pinto*." *Id.* at 175. We reached this question less than a year later, in *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan*, 298 F.3d 191 (3d Cir. 2002). In *Smathers*, we concluded that an employer's unfunded and self-adminstered benefits plan presented a conflict that, though "not extraordinary," did warrant "somewhat heightened" scrutiny, requiring "a more penetrating review of [the] administrator's decisionmaking process than would normally be conducted under the arbitrary and capricious standard." *Id.* at 199. Most recently, we approved a district court's holding that the unfunded and self-administered benefit plan in *Stratton v. E.I. DuPont de Nemours & Co.*, 363 F.3d 250, 255 (3d Cir. 2004), warranted only a "slightly heightened form of arbitrary and capricious review."

As we noted in *Pinto* itself, the financial and administrative relationship between the employer and the benefit plan is not the only relevant consideration. For example, in *Stratton*, we observed that while an employer administering an unfunded plan may have a financial incentive to deny the claims of its employees, it thereby risks "the loss of morale and higher wage demands that could result from denials of benefits." 363 F.3d at 254 (quoting *Nazay v. Miller*, 949 F.2d 1323, 1335 (3d Cir. 1991)); *see also Smathers*, 298 F.3d at 198; *Pinto*, 214 F.3d at 389. We have recognized the inverse as well: When a *former* employee seeks benefits, this conflict-mitigating consideration is not present. *See Smathers*, 298 F.3d at 198 ("Since Smathers was no longer an employee when Multi-Tool made its decision to deny his claims, the counterbalancing of its monetary self-interest by possible concerns about the impact of its decision on morale and wage demands would thereby be lessened.").

Indeed, we made the general point about the short-circuiting of incentives by imperfect information flow in *Pinto* itself:

> [M]any claims for benefits are made after individuals have left

active employment and are seeking pension or disability benefits. Details about the handling of those claims, whether responsible or irresponsible, are unlikely to seep into the collective knowledge of still-active employees. If Pinto's claim is denied, few at Rhone-Poulenc will learn of it, and Reliance Standard will have little motive to heed the economic advice of the Seventh Circuit that "it is a poor business decision to resist paying meritorious claims for benefits."

214 F.3d at 388 (quoting *Mers v. Mariott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1020 (7th Cir. 1998)); *see also id.* at 392 (noting the relevance of the current relationship between the fiduciary and beneficiary). In short, our precedents recognize that the situation of an individual claiming benefits from her former employer may, for *Pinto* purposes, be more akin to that of an insured claiming benefits from an insurance company than that of an employee claiming benefits from her current employer.

Our precedents establish at least one more cause for heightened review: demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits. The *Pinto* panel's decision to apply heightened review turned almost as much on the procedures afforded to Pinto as it did on

her insurer's financial conflict of interest. *See Pinto*, 214 F.3d at 393 ("[L]ooking at the final decision, we see a selectivity that appears self-serving in the administrator's use of [one doctor's] expertise."); *id.* ("[i]nconsistent treatment of the same facts"); *id.* at 394 (suggesting that "whenever it was at a crossroads, Reliance Standard chose the decision disfavorable to Pinto"). Though no case since *Pinto* appears to have turned on evidence of procedural bias or unfairness, the corresponding negative pregnant appears in several of our cases. *See Skretvedt*, 268 F.3d at 175-76 (considering but rejecting allegations of decisionmaker bias in the benefits review system); *Goldstein*, 251 F.3d at 435-36 (noting that heightened review would be required when "the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case"); *Bill Gray Enters., Inc. Employee Health & Welfare Plan v. Gourley*, 248 F.3d 206, 216 (3d Cir. 2001) ("[U]nless specific evidence of bias or bad-faith has been submitted, plans . . . are reviewed under the traditional arbitrary and capricious standard."); *id.* at 216 n.8 ("Gourley has failed to allege bias on the part of the plan administrator . . . .").

B. The Appropriate Standard of Review in This Case

We begin with the financial and administrative arrangement between Merck and the Plan. The District Court found that Epps-Malloy had offered no evidence on the mechanism by which Merck funds the Plan beyond the bare statement in the Plan itself that "[Merck]

shall pay the cost of the benefits provided under the Plan." By the Plan's terms, Merck is the plan administrator, and even though it has delegated claims administrative authority to UNUM, it exercises ultimate administrative authority as evidenced by its request that Epps-Malloy be examined by Dr. Dev. But since Epps-Malloy has not excluded the possibility that Merck pays for the benefits it administers through fixed contributions to an actuarially grounded fund, thereby leaving Merck with no immediate financial conflict of interest, we do not impose a heightened standard of review on this ground.[5] We reiterate, however, our

conclusion above that Epps-Malloy's status as a *former* employee might well trigger some heightened level of review if, for example, Merck pays Plan benefits out of its general operating funds.

Epps-Malloy's argument for heightened review draws more support from our discussion in *Pinto* of procedural bias. As described above, Merck intervened in Epps-Malloy's appeal process, requesting that she submit to an "Independent Medical Exam," ultimately conducted by Dr. Dev. Merck surely has the authority under the plan to require such an exam—the Plan empowers Merck as Administrator "to request and receive from all Participants such information [as is] necessary for the proper administration of the Plan." But the circumstances under which Merck made this request necessarily raise an inference of bias: At the time of the request, every piece of evidence in Epps-Malloy's record—the opinions of two doctors (Drs. Williams and McQueen), a consistent medical history, and an SSA determination that she was totally disabled—supported her contention that she was disabled.[6] The District

---

[5]The District Court may, of course, allow the parties on remand to supplement the record to introduce evidence of the Plan's actual funding mechanism. While we have held that, in general, the record for arbitrary-and-capricious review of ERISA benefits denial is the record made before the plan administrator, and cannot be supplemented during litigation, *see Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997), when a court is deciding what standard of review to employ—arbitrary-and-capricious review, or some higher standard under *Pinto*—it may consider evidence of of potential biases and conflicts of interest that is not found in the administrator's record. The Plan's funding mechanism might well be evidence of this sort. *See, e.g.*, *Stratton*, 363 F.3d at 254-55 (considering an ERISA plan's funding and decisionmaking mechanisms in

deciding on a level of review); *Skretvedt*, 268 F.3d at 174-75 (same). We leave this decision to the sound discretion of the District Court.

[6]We express no view on the relevance *vel non* in the ERISA benefits context of an SSA finding of total disability. It is enough for our purposes here to note that the SSA ruling gives at least some

10

Court's discussion is consistent with this view: It recognized that Epps-Malloy's physician's reports uniformly supported her contentions (though they were, in some aspects, incomplete), and that the defendants' denial of benefits was grounded on Dr. Dev's report, augmented by medical opinions offered by one Nurse Girardo based on a review of Epps-Malloy's file.

It is in this light that we must view Merck's request for an independent medical examination. We have a claimant seeking continued LTD benefits whose treating physicians offer unequivocal support for her claims, and a plan administrator that has delegated claims administration to a large insurance company intervening—not at the initial determination stage, but at the appeal stage—with a request for an additional medical examination to be performed by a physician of its own choosing. This situation arguably has a quality to it that undermines the administrator's claim to the deference normally owed to plan fiduciaries. Given how favorable the record was to Epps-Malloy prior to Dr. Dev's examination, the most natural inference is that by intervening and ordering the retention of Dr. Dev, thus seeking evidence to counter Epps-Malloy's physicians' evaluation, Merck was not being a disinterested fiduciary.

That said, we acknowledge the possibility that Merck acted with a good

faith belief that Epps-Malloy's application was a close call, and that it could resolve perceived ambiguities with a third physician's opinion. Independent medical examinations are not uncommon in the claims administration world, and this is responsible plan administration that we would not wish to deter. At this stage, however, we are considering only how searching a review of the defendants' benefits determination to undertake. Epps-Malloy's suit will rise or fall with the merits of her underlying claim (including Dr. Dev's opinion), modulated by the deference owed to the defendants' decision. For a responsible fiduciary, we trust that the incentive to collect enough information to make a responsible claims determination will outweigh the incentive to avoid requesting more information in the hopes of maintaining the most deferential standard of review. And we trust that courts will not penalize plan administrators for seeking independent medical examinations at appropriate stages of the claims determination process.

We conclude that the procedural bias we have described in Epps-Malloy's appeals process warrants a moderately heightened arbitrary and capricious standard of review. Naturally, a significantly heightened arbitrary and capricious standard of review would be warranted if Merck also acted under a financial conflict of interest, but, as noted above, the record before us does not demonstrate such a conflict. Because the District Court applied an unmodified arbitrary and capricious standard of review to the defendants' actions, we will set

support for Epps-Malloy's claim for ERISA benefits.

11

aside the judgment and remand for a new trial on the merits under an appropriate standard of judicial review. Because the question whether the defendants' determination can stand is essentially an ultimate issue of fact, it is appropriate for the District Court to undertake that inquiry in the first instance. *See* Fed. R. Civ. P. 52(a); *cf. Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982) (holding that clearly erroneous review applies to ultimate issues of fact as well as subsidiary findings of fact).

## IV. The District Court's Conclusion on the Merits

Even if we were not setting aside the District Court's conclusion on the merits because of the standard of review it applied, we would be constrained to do so because it did not adequately address the defendants' denial of LTD benefits to Epps-Malloy in light of her diagnosis of fibromyalgia. While one diagnosis in Epps-Malloy's records is sarcoidosis, she was also diagnosed with fibromyalgia. Not only did her doctors ascribe aspects of her disability to fibromyalgia, the ALJ appears to have granted SSA benefits to Epps-Malloy principally on the basis of her fibromyalgia. As noted above, Dr. Dev's report is the defendants' best counter to Epps-Malloy's physicians' diagnoses, but, as the District Court itself found, "[Dr. Dev] did not address the previous diagnosis of fibromyalgia or any other condition." This is hardly surprising, as Dr. Dev is a pulmonologist, and fibromyalgia is most commonly treated by a rheumatologist.

It would be premature to hold that, given the record on Epps-Malloy's alleged fibromyalgia, the defendants' denial of benefits to her was impermissible as a matter of law. Doctor Dev did, in fact, apparently perform a musculo-skeletal examination, finding "unremarkable" results; this may be evidence that Epps-Malloy was not disabled by fibromyalgia. But it is plain that the District Court did not adequately address the defendants' treatment of Epps-Malloy's fibromyalgia diagnosis. On remand, the District Court should separately consider the defendants' determinations regarding the two distinct infirmities from which Epps-Malloy allegedly suffers.

That Court's review of these determinations should be based on the record available to the plan administrator in making its own decision; if there is not sufficient evidence in the defendants' record to support their decision as to the fibromyalgia claim, then it must be reversed. *See Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3d Cir. 1997); *cf. Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 381 (10th Cir. 1992) ("In effect, a curtain falls when the fiduciary completes its review, and for purposes of determining if substantial evidence supported the decision, the district court must evaluate the record as it was at the time of the decision."). While the District Court may take further evidence to aid in its understanding of the medical issues involved, it must base its ultimate determination on the record before the

plan administrator, not its own judgment of whether Epps-Malloy was disabled. We leave it to the District Court to determine whether the defendants' treatment of Epps-Malloy's fibromyalgia claims met the moderately heightened arbitrary and capricious standard that we have identified.

## V. Conclusion

Because the original bench trial proceeded on too deferential a standard of review, we will reverse the judgment of the District Court and remand for a new trial on the merits.